IN THE UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

CASE NO. 18-CR-20968-ALTMAN

**UNITED STATES OF AMERICA,**

    *Plaintiff*,

v.

**TALLISSA CAESAR,**
*(USM# 11002-094)*

    *Defendant*.
_____/

## ORDER

**THIS MATTER** comes before the Court on the Defendant's Motion to Dismiss Count One of the Indictment ("the Motion") [ECF No. 76].[1] The Court has considered the Motion, the record, and the governing law. For the following reasons, the Court **GRANTS** the Defendant's Motion and hereby **DISMISSES** Count One of the Indictment.

## THE FACTS

On December 18, 2018, a federal grand jury charged the Defendant with (1) conspiracy to import cocaine, in violation of 21 U.S.C. § 963 (Count One), and (2) conspiracy to possess cocaine with the intent to distribute, in violation of 21 U.S.C. § 846 (Count Two). *See* Indictment [ECF No. 3] at 1–3. On August 26, 2019, the case proceeded to trial. *See* Trial Tr. [ECF Nos. 91–94].

At trial, the Government sought to establish that the Defendant had conspired with three other people—Juvanni Roach, Keshia Milligan, and David Joseph—to transport cocaine from the

---

[1] After the Government filed its Response [ECF No. 80], and the Defendant submitted her Reply [ECF No. 84], the Court granted the Government leave to file an Amended Response [ECF No. 97], which the Defendant parried with her Supplemental Reply [ECF No. 98].

U.S. Virgin Islands to Florida. *See* Trial Tr. at 174–84. In its opening statement, the Government laid out the sequence of events: On an American Airlines flight between St. Croix and Miami, Roach—a passenger on that flight—walked into the lavatory to retrieve two packages of cocaine, which had been left there for him by the Defendant. *Id.* at 174–77. But, as he was pulling one of the two packages out of the lavatory's trash bin, he aroused the suspicion of a flight attendant, who ordered Roach back to his seat and later discovered the second package in the trash bin. *Id.* at 175–76.

Soon after the plane landed, Roach, who was promptly arrested, began cooperating against Joseph—the St. Croix supplier of the cocaine—and Joseph's then-girlfriend, Milligan, who had recruited Roach to take the trip. *Id.* at 178–80. But, according to the Government, it was the Defendant—an American Airlines contractor at the St. Croix airport—who had received the cocaine from Joseph, carried it onto the plan, and deposited it into the trash bin so that Joseph, whom she had driven to the airport, could later retrieve it. *Id.* at 183–84. During that car ride to the airport, the Government told the jury, the Defendant described for Roach precisely where she planned to hide the cocaine. *Id.* at 179.

In her opening statement, the Defendant did two things: *first*, she impugned the credibility of Roach and Milligan, the Government's cooperating witnesses, *id.* at 186–88; *second*, she argued that, because the Government would be unable to present any *physical* evidence linking her to the cocaine, the jury would be left, at the end of the case, with a lingering doubt—a reasonable doubt—as to whether the Defendant had ever possessed the cocaine or placed it on the plane, *id.* at 188–90.

Roach testified that Milligan had recruited him to board the flight to Miami, that she had helped him obtain an identification card, and that she had paid him $1,200 for his efforts. *Id.* at

329–32, 345–46, 378, 386. Turning to the Defendant, Roach said that she had driven him to the airport before his flight. *Id.* at 337. According to Roach, on this ride, the Defendant instructed him to collect a package from the trash bin in the lavatory that was at the back of the plane and on the same side of the aircraft as his seat. *Id.* at 337–39. In Roach's telling, when he entered this lavatory, he saw in the trash bin two packages, but was able to retrieve only one. *Id.* at 342–44. Roach testified that he did not know what was inside the packages. *Id.* at 347–48, 376–77.

On cross-examination, Roach acknowledged that his testimony was inconsistent with several statements he had made during his initial interview with the police. *See id.* at 365–68, 386, 394–95. Notably, in that initial interrogation, Roach did not mention that the Defendant had driven him to the airport and did not say that the Defendant had given him any instructions about what to do on the plane. *Id.* at 365, 374, 377. Roach acknowledged that he had lied during that interview—conceding, at one point, that he had been "beating around the bush"—but he nevertheless insisted that he was telling the truth at trial. *Id.* at 365–66, 374–75. Roach added that he did not want a sentencing reduction in exchange for his trial testimony. *Id.* at 357, 363–64.

Milligan's testimony went even less smoothly. Milligan testified that she had asked Roach to take the plane trip and that, after some initial hesitation, he agreed. *Id.* at 445–47. Milligan provided Roach's personal information to Joseph, a cocaine supplier, who then purchased Roach's plane ticket for him. *Id.* at 467–68, 489. Milligan asked the Defendant to give Roach a ride to the airport. *Id.* at 450, 463. After Roach arrived at the airport, he called Milligan and said that the Defendant had told him "where it's gonna be"—though Roach did not explain what "it" referred to. *Id.* at 463–64.

But Milligan also explained that she had only asked the Defendant to drive Roach to the airport because Milligan's car had broken down. *Id.* at 491–93. If her car had been working

properly, Milligan said, she would have driven Roach herself. *Id.* at 504. Milligan claimed that she had never had any conversations with the Defendant about placing drugs on the plane. *Id.* at 502–03. In fact, although Milligan knew that the Defendant worked for American Airlines, she did not know whether *any* airport worker—let alone the Defendant—had been involved in the conspiracy. *Id.* at 466, 497, 506–07. Milligan insisted that she had never seen the cocaine and that she did not know who had brought it onto the plane. *Id.* at 484, 503, 517–18.

At the end of its case-in-chief, the Government introduced a video recording of a statement the Defendant had given to investigators, during the course of which she had admitted to strapping the two packages of cocaine onto her body, covering them up with her shirt, walking them onto the airplane, and then depositing them into the lavatory's trash bin so that Roach could retrieve them. *See id.* at 644–48.[2] The Defendant declined to present any evidence or to testify. *Id.* at 695–96, 708.

In her closing argument, the Defendant reemphasized the themes she had presaged in her opening. She contended that Roach was not a credible witness and that Milligan's testimony had "sort of backfired on the government." *Id.* at 750–52, 757. She reiterated her view that the absence of any physical evidence linking her to the cocaine—including any fingerprints, DNA, or video surveillance—should leave the jurors with a reasonable doubt about whether she had ever, in fact, possessed the cocaine or brought it onto the plane. *Id.* at 744–46, 748–49, 768. And she sought to

---

[2] The Defendant's interview went on for several hours and included her confessions to a number of extrinsic and unrelated crimes, about which the Government had failed to file a proper notice under FED. R. EVID. 404(b). *See* Trial Tr. at 244–60. The Court therefore granted the Defendant's motion to exclude those extrinsic confessions and required the Government to introduce an edited version of the interview, which lasted approximately 46 minutes. *See id.* at 642, 648, 841. By contrast, the Court separately found that the Government's Rule 404(b) notice *was* sufficient as to the proffered testimony of another Government witness, Amarrah Stevens—though the Court excluded her testimony for other reasons. *See* Trial Tr. at 693–94.

cast doubt on the reliability of her recorded statement by suggesting that the investigators' lengthy, leading, and aggressive questioning had broken her down and coerced her into confessing to a crime she did not commit. *Id.* at 743–44. To bolster this theory, she identified several factual inconsistencies between her statement and the testimonies of Roach and Milligan—inconsistencies that, she insisted, would not have manifested themselves had everyone been telling the truth. *Id.* at 750, 754–55, 758.

During its deliberations, the jury evidently homed in on the Defendant's recorded statement. In one note, the jury requested access to the Defendant's entire, hours-long interview and asked how much time had elapsed before the Defendant confessed. *See* Jury Notes [ECF No. 64] at 2. Noting that the full interview had not been admitted into evidence, the Court instructed the jury to consider only the evidence that had been introduced at the trial. *Id.* at 3; *see* Trial Tr. at 830–36.

In a second note, though, the jury asked to re-watch the 46-minute video, which had been introduced. *See* Jury Notes at 4. To accommodate this request, the Court brought the jury back into the courtroom and replayed for them the edited video of the Defendant's recorded statement. Trial Tr. at 839–40. Noting that, during this viewing, one juror was whispering to another, the Court paused the recording and admonished the jurors not to discuss the case with one another unless all twelve jurors were present and able to participate in the conversation. *Id.* at 841. The Government never moved to strike or remove any juror, and the video replay concluded without further incident. *Id.*

After lengthy deliberations and an *Allen* charge, *id.* at 851–55, the jury returned a verdict of Not Guilty on the charge of conspiracy to possess with intent to distribute cocaine (Count Two). *Id.* at 860; Verdict Form [ECF No. 61] at 1. The jury failed to reach a verdict on the charge of

5

conspiracy to import cocaine (Count One), *see* Trial Tr. at 859–60, and the Court declared a mistrial on that count. *Id.* at 862; *see also* Judgment of Acquittal on Count Two [ECF No. 62].

On September 9, 2019, the Government notified the Court and the Defendant of its intent to retry the Defendant on Count One. [ECF No. 66]. The Defendant then filed her Motion to Dismiss Count One under the doctrine of collateral estoppel. Mot. [ECF No. 76] at 3–5. In that Motion, the Defendant contends that, in finding her Not Guilty on Count Two, the jury "necessarily determined" that she "did not agree to have the cocaine placed on a plane headed for the United States, she did not provide information about its location, and she did not carry it through security or place it on the plane so that it could be imported into the United States." *Id.* at 5. Those factual questions, the Defendant says, cannot now be relitigated. And, she adds, because those facts are "essential elements" of the Government's theory on Count One, that count must be dismissed. *Id.*

## THE LAW

The doctrine of collateral estoppel "means simply that when an issue of ultimate fact has once been determined by a valid and final judgment, that issue cannot again be litigated between the same parties in any future lawsuit." *Ashe v. Swenson*, 397 U.S. 436, 443 (1970). In the criminal context, "this established rule of federal law is embodied in the Fifth Amendment guarantee against double jeopardy." *Id.* at 445–46. Thus, collateral estoppel creates an exception to the rule that the Fifth Amendment's Double Jeopardy Clause "does not generally preclude the government from reprosecuting defendants on mistried counts." *United States v. Crabtree*, 878 F.3d 1274, 1281 (11th Cir. 2018).

In determining whether collateral estoppel bars retrial of a mistried count, a court first "must examine the verdict and the record to see what facts, if any, were necessarily determined in the acquittal at the first trial. Second, the court must determine whether the previously determined

6

facts constituted an essential element of the mistried count." *United States v. Shenberg*, 89 F.3d 1461, 1479 (11th Cir. 1996) (citation and internal quotation marks omitted). "This is an objective inquiry which asks whether a rational jury could have grounded its verdict upon an issue other than that which the defendant seeks to foreclose from consideration." *Crabtree*, 878 F.3d at 1281 (internal quotation marks omitted). In this context, an "essential element" means, not a legal element, but rather "a factual component of an offense." *United States v. Ohayon*, 483 F.3d 1281, 1293 (11th Cir. 2007). "The party asserting estoppel bears the burden of persuasion that the jury found the facts on which the defense of estoppel rests and that those facts bar another trial about them." *Id.* at 1286.

Lastly, and of critical importance here, "[t]o identify what a jury necessarily determined at trial, courts should scrutinize a jury's decisions, not its failures to decide." *Yeager v. United States*, 557 U.S. 110, 122 (2009). As a result, "the consideration of hung counts *has no place* in the issue-preclusion analysis." *Id.* (emphasis added).

**ANALYSIS**

At trial, the Government sought to establish the following three crucial facts: (1) the Defendant agreed with at least one other coconspirator—but probably two, Roach and Milligan—to place cocaine on a flight bound for Miami; in furtherance of this agreement, (2) she physically carried the cocaine onto the plane and hid it in the trash bin of one of the airplane's lavatories so that Roach could retrieve it; and (3) she drove Roach—the mule—to the airport for his flight and, during that car ride, told him precisely where he would find the cocaine. *See* Am. Resp. [ECF No. 97] at 4; Supp. Reply [ECF No. 98] at 1; *see also* Trial Tr. at 183 (the Government's opening statement, in which the prosecutor assured the jury that "[c]arrying the cocaine to the airport, receiving it from the supplier, which is what this defendant did, that connects her to this

7

conspiracy"). In her Motion, the Defendant argues that the jury could not have acquitted her on Count Two without concluding that there was (*at least*) a reasonable doubt as to whether she did any of these three things. *See* Mot. at 5; *cf.* Supp. Reply at 2. The Court agrees.

Had the jury concluded that the Defendant committed *any* of these three acts, it would have found her guilty of conspiring to possess with the intent to distribute cocaine—as charged in Count Two of the Indictment. *See* Jury Instructions [ECF No. 60] at 11 ("If the Defendant played only a minor part in the plan but had a general understanding of the unlawful purpose of the plan – and willfully joined in the plan on at least one occasion – that's sufficient for you to find the Defendant guilty."). The Court, after all, provided the jury with detailed instructions on the elements of this offense, including the applicable definitions of "conspiracy" and "possession," *see id.* at 9–11, 13, and the Court presumes that the jury heeded those instructions and properly applied the governing law. *See, e.g.*, *United States v. Stone*, 9 F.3d 934, 938 (11th Cir. 1993) ("Few tenets are more fundamental to our jury trial system than the presumption that juries obey the court's instructions."). Because, in short, any of the above three facts, if proven, would have been sufficient for the jury to find the Defendant guilty of Count Two, the jury must have harbored *at least* a reasonable doubt as to whether she committed *any* of those acts. Under the doctrine of collateral estoppel, then, none of those facts may be relitigated. *See Ashe*, 397 U.S. at 443.

Turning to the second step of the collateral-estoppel inquiry, the Court finds that these three facts would be "essential" to any retrial of the charge contained in Count One of the Indictment. Put differently, the Court cannot conceive of a rational theory by which—on these facts—the Defendant could have conspired to import cocaine into the United States without also having

conspired to possess the cocaine with the intent to distribute it.[3] To be clear, this isn't because such a scenario is inconceivable in the abstract. After all, one can easily imagine a theoretical defendant who, together with a friend, conspired to import a small amount of cocaine *for personal consumption*. In this hypothetical scenario, a jury could well find the defendants not guilty of conspiring to possess cocaine *with the intent to distribute* without precluding a subsequent finding that the defendants conspired to import cocaine into the United States. But, in making its collateral-estoppel determination, the Court may not make use of abstractions. Indeed, the Supreme Court has been clear that "the rule of collateral estoppel in criminal cases is not to be applied with the hypertechnical and archaic approach of a 19th century pleading book, but with realism and rationality," to be "set in a practical frame and viewed with an eye to all the circumstances of the proceedings." *Ashe*, 397 U.S. at 444 (internal quotation marks omitted). The Court may not, in other words, speculate about hypothetical grounds for acquittal that have no plausible basis in the record.[4]

And, *on these facts*—in this case—a rational jury could not have found that the amount of cocaine involved was, strictly speaking, for personal consumption. To begin with, the Government established that, together, the two packages contained approximately two kilograms of cocaine. *See* Trial Tr. at 544–49, 663, 687; *see also United States v. Hernandez*, 896 F.2d 513, 520 (11th

---

[3] The inverse scenario, to be sure, would not result in preclusion. Consider, for example, what might have happened if the jury had acquitted the Defendant on Count One and mis-tried as to Count Two. In this circumstance, a rational jury could have found that there was a reasonable doubt as to whether the Defendant intended for the cocaine to reach the United States—an essential element of Count One—without necessarily having concluded that there was a reasonable doubt as to whether she conspired to possess the cocaine with the intent to distribute it.

[4] As the *Ashe* Court observed, "'[i]f a later court is permitted to state that the jury may have disbelieved substantial and uncontradicted evidence of the prosecution on a point the defendant did not contest, the possible multiplicity of prosecutions is staggering.'" *Id.* at 444 n.9 (quoting Daniel K. Mayers and Fletcher L. Yarbrough, *Bis Vexari: New Trials and Successive Prosecutions*, 74 HARV. L. REV. 1, 38 (1960).

9

Cir. 1990) (possession of "approximately one kilogram of cocaine" sufficient for jury to infer intent to distribute); *United States v. Grayson*, 625 F.2d 66, 66–67 (5th Cir. 1980) (possession of "equivalent of 304.77 grams of cocaine" sufficient to support same inference). Second, it was the Government's theory of the case that the Defendant had physically dumped the cocaine into the lavatory so that Roach could retrieve it—that is, that she had possessed the cocaine with the intent to distribute it to someone else. And third, the Government contended at trial that the entire purpose of the scheme was, not for the Defendant and Roach to consume the cocaine themselves, but for Roach to transport the cocaine to a Florida coconspirator—further evidence of their intent to distribute. The Government cannot now argue, in sum, that a rational jury might have found that the Defendant conspired only to possess the cocaine for personal consumption. And, indeed, to its credit, the Government does not press this counterfactual inference. *See* Am. Resp. at 4–9. But the Government offers no *other* explanation for the jury's verdict either. In fact, despite the Court's repeated requests,[5] the Government could not provide even a single theory by which, *on these facts*, a rational jury could have concluded both that (1) the Defendant *did not* conspire to possess the cocaine with the intent to distribute it, and yet, (2) the Defendant *did* conspire to import the cocaine into the United States.

To summarize, then, if allowed to retry the Defendant on Count One, the Government would ask this second jury to conclude that the Defendant conspired to import cocaine into the United States. If the second jury agreed, it would have found that there was *no reasonable doubt*

---

[5] At a status conference on November 25, 2019, the Court granted the Government leave to file its Amended Response. In doing so, however, the Court implored the Government to explain precisely how, *on these facts*, a rational jury could have found that the Defendant did not conspire to *possess* the cocaine without also finding that she did not conspire to *import* the cocaine. When the Amended Response failed to provide such an explanation, the Court, at oral argument, again asked the Government for its position on this all-important question. The Government had nothing.

as to whether the Defendant committed *at least* one of the now-foreclosed three facts set out above—a finding that, it goes without saying, would directly contradict the first jury's findings. This is precisely what the doctrine of collateral estoppel forbids.

The Government's arguments to the contrary are unconvincing.

*First*, the Government contends that the Defendant's Motion fails to identify the specific facts the jury "necessarily determined" at the first trial. *See* Am. Resp. at 4. But, although the Government ignores it, that is precisely what the Defendant has done—three times, in fact: once in her Motion; a second time in her Reply; and a third time, for good measure, in her Supplemental Reply. *See* Mot. at 5 ("[T]he jury concluded Caesar did not agree to have the cocaine placed on a plane headed for the United States, she did not provide information about its location, and she did not carry it through security or place it on the plane so that it could be imported into the United States."); Reply [ECF No. 84] at 4 ("[T]he jury rejected the government's evidence that Caesar agreed to have the cocaine placed on a plane headed for the United States, that she provided information about its location, that she carried it through security or placed it on the plane so that it could be imported into the United States."); Supp. Reply at 1–2 ("[I]f the jury had accepted any one of [the Government's previously identified factual assertions] as truth, it would have found Caesar guilty of conspiracy to possess with intent to distribute the cocaine.").

*Second*, the Government posits that, in reaching its Not Guilty verdict on Count Two, the jury did not necessarily reject *all* of the Government's evidence. Am. Resp. at 4–6. Pushing along this same line, the Government speculated, during oral argument, that the jury *may have* credited certain portions of Roach's testimony. But these arguments miss the point. It is, of course, entirely possible that the jury accepted *some* of the Government's evidence. But, taking the evidence as a whole, the jury still harbored *at least* some reasonable doubt as to the Defendant's guilt—

reasonable doubt, that is, as to whether the Defendant conspired to possess cocaine with the intent to distribute it. And so, whether the jury believed certain aspects of Roach's story is, as it were, neither here nor there.

*Third*, and relatedly, the Government relies heavily on *United States v. Bennett*, 836 F.2d 1314 (11th Cir. 1988), where the Eleventh Circuit rejected a defendant's argument that his acquittal on a cocaine *importation* charge collaterally estopped the Government from retrying him on a cocaine *possession* charge (as to which a mistrial had been declared). *See* Am. Resp. at 7–8 (citing *Bennett*, 836 F.2d at 1315–17). In the Government's view, *Bennett* stands for the proposition that "[a] jury's inability to resolve mistried counts means that the jury did not reject the evidence concerning those counts." Am. Resp. at 7 (emphasis removed). Indeed, the Government finds significance in the fact "[t]hat the Caesar jury could not decide count one (as opposed to returning an acquittal)." *Id.* at 8. But, as the Supreme Court has since made clear, a jury's inability to resolve mis-tried counts means absolutely nothing. *See Yeager*, 557 U.S. at 120–22; *see also Ohayon*, 483 F.3d at 1289–90 (criticizing this aspect of *Bennett*'s reasoning). The operative question, again, is "what facts, if any, were necessarily determined in the acquittal at the first trial," *Shenberg*, 89 F.3d at 1479—and not, as the Government proposes, what meaning, if any, the Court might extrapolate from the jury's deadlock.

Notably, *Bennett* did articulate an alternate ground for its conclusion that the doctrine of collateral estoppel was inapplicable: on the facts of that case, the court said, a rational jury could have acquitted the defendant of the importation charge without *necessarily* precluding a finding of guilt on the possession count. *Bennett*, 836 F.2d at 1316–17; *see also Ohayon*, 483 F.3d at 1290–91 (approving this aspect of *Bennett*'s reasoning). And, indeed—as the Court pointed out in note 3, *supra*—the Court would have denied the Defendant's Motion *in this case* if, as in *Bennett*, the

jury had acquitted the Defendant on Count One and mis-tried with respect to Count Two. In this circumstance, again, a rational jury could have found that there was a reasonable doubt as to whether the Defendant intended for the cocaine to reach the United States—an essential element of Count One—without necessarily concluding that there was a reasonable doubt as to whether she conspired to possess the cocaine with the intent to distribute it.

Here, by contrast, the jury acquitted the Defendant of the possession charge and deadlocked on the importation count. And, on the facts of *this case*, the alleged conspiracy to possess the cocaine with the intent to distribute was, as the Government argued in closing argument, subsumed within the conspiracy to import. *See* Trial Tr. at 726 ("David Joseph, Keshia Milligan, this defendant, Tallissa Caesar, along with Mr. Roach comprised of a conspiratorial group who agreed to a plan to import cocaine into the United States. And *as part of that plan*, agreed to possess the cocaine with the intent to distribute it." (emphasis added)). Unlike *Bennett*, then, the jury's acquittal *in this case* on the charge of conspiracy to possess cocaine with the intent to distribute left nothing for the Government to retry.

*Fourth*, the Government's reliance on *United States v. Gil*, 142 F.3d 1398 (11th Cir. 1998), and *United States v. Mathurin*, 868 F.3d 921 (11th Cir. 2017), *cert. denied*, 139 S. Ct. 55 (2018), *see* Am. Resp. at 6–7, is likewise unavailing. Both cases involve straightforward applications of the Supreme Court's decision in *Dowling v. United States*, 493 U.S. 342 (1990), which held that "the collateral-estoppel component of the Double Jeopardy Clause" does not "exclude in all circumstances . . . relevant and probative evidence that is otherwise admissible under the Rules of Evidence simply because it relates to alleged criminal conduct for which a defendant has been acquitted." *Dowling*, 493 U.S. at 348; *see Mathurin*, 868 F.3d at 930; *Gil*, 142 F.3d at 1401–02. But the issue here is, not the admissibility of the Government's evidence at a *new trial*, but whether

13

the Double Jeopardy Clause precludes such a trial in the first instance—a question the *Gil* and *Mathurin* panels did not have to answer.[6] In short, neither case advances the Government's position here.

*Finally*, the Government suggested during oral argument that the jury's deliberation process may have been tainted by the improper whisper that occurred while the video of the Defendant's statement was being replayed. The Government never explains why this whisper supports its position—and the Court is not obligated to divine the parties' arguments for them. *Singh v. U.S. Atty. Gen.*, 561 F.3d 1275, 1278 (11th Cir. 2009) ("[S]imply stating that an issue exists, without further argument or discussion," is not sufficient to preserve a party's right to contest that issue). In any event, the jury's preoccupation with the video recording does not help the Government. That preoccupation, after all, could support one of two inferences. The first is that the jury believed the Defendant was guilty, but, in an act of nullification, acquitted her anyway—presumably because it felt badly for the lengthy interrogation she endured. But there are at least two major problems with this inference. *First*, nothing in the record supports it. *Second*, the Eleventh Circuit has admonished district courts never to assume, in conducting the collateral-estoppel analysis, that the jury's verdict resulted from an act of nullification. *See Ohayon*, 483 F.3d

---

[6] *Gil* is distinguishable on still another ground. The jury in that case acquitted the defendant of possessing cocaine with the intent to distribute it, but hung on the separate charge of conspiracy to possess cocaine with the intent to distribute. *Gil*, 142 F.3d at 1400. The Eleventh Circuit found that the doctrine of collateral estoppel was inapplicable because, "even if the jury found that [the defendant] did not touch the cocaine, it did not determine an ultimate issue with regard to the conspiracy count." *Id.* at 1401–02. And this makes sense. To say that a defendant did not possess cocaine herself does not preclude a separate finding that the defendant *agreed* with another person to possess that cocaine—even if the cocaine was never in fact possessed. Here, by contrast, when one removes from consideration the facts the jury "necessarily determined" in acquitting the Defendant of conspiring to possess cocaine with intent to distribute, there is no plausible way—on the facts the Government presented (and would present) at trial—by which the Defendant could have conspired to import that same cocaine.

14

at 1288 ("The possibility of jury nullification . . . plays no part in collateral estoppel analysis."). The second inference that can be drawn from the jury's preoccupation with the video is that they perceived its significance. But this is unsurprising. The video was a critical piece in the Government's case against the Defendant. And, after viewing it closely multiple times, the jurors continued to harbor a reasonable doubt with respect to the Defendant's guilt.

******

The Court is not unsympathetic to the Government's view that the Defendant may well have violated the law, that she may have confessed to that violation in a lengthy video-taped recording, and that her confession revealed her involvement in a long, uninterrupted string of uncharged criminal conduct. But the jury has spoken, and the legal implications of its verdict are clear. It is manifestly the Court's duty to follow the law—not to make it. Accordingly, having carefully considered the Motion, the record, and the governing law, the Court hereby

**ORDERS AND ADJUDGES** that the Motion is **GRANTED**. The Court **DISMISSES** Count One of the Indictment against the Defendant, Tallissa Caesar. The Clerk of Court is directed to **CLOSE** this case. Any pending motions are **DENIED as moot**, all pending hearings are **CANCELLED**, and all upcoming deadlines are **TERMINATED**.

**DONE AND ORDERED** in Chambers at Fort Lauderdale, Florida, this 11th day of December 2019.

_____
**ROY K. ALTMAN**
**UNITED STATES DISTRICT JUDGE**

cc:  Michael Mirer, Esq.
  Terry Lindsey, AUSA
  United States Marshals Office